This argued case this morning is number 14, 1434, Dey LP v. Teva Parenteral Medicines, Inc., Mr. Goodell. Thank you, Your Honor. May it please the court. The district court decision is based on three critical and fundamental errors. The first is that the claims were manipulated like a nose of wax, twisted one way for infringement and twisted another way for validity. This skewed the invalidity analysis that the district court made. The second problem is the court reached the wrong conclusion with respect to the separate core lots for two reasons. One, the separate core lots were on sale and that impacts the obviousness and the anticipation of the asserted claims. The second is even if the lots were not on sale, the lots constitute evidence of obviousness to one of ordinary skill in the art and shows the obviousness of the claim. Mr. Goodell, would you speak up a little, please. Yes, I'm sorry, Your Honor. The third is that the court overlooked the inherency or disregarded, discounted the inherency argument as part of the obviousness analysis. And recent decision by this court clearly indicates that, this is the Parr v. Twee case, clearly indicates that inherency is to be considered in the obviousness analysis. Counsel, if you had to pick one issue that you'd like to win on, would you tell us which one it is? Yes, sir. I would like to win on the question of invalidity. The question of? The question of invalidity. Invalidity. Yes. I believe that if the claims are construed consistently and if this court determines that the question of the photo stability is not part of the claims, or is not a claim element, or that the composition per se, and we've explained this in our briefs, that the composition without packaging is in fact not part of the claims, that the stability of that composition is not part of the claims, then we think it's very clear that the claims are invalid under 102 and 103. And the reason I say that is we'd like a clear, consistent construction that allows us to apply that construction either in the infringement context or in the invalidity context. And the reason I say that is because we had argued on summary judgment that the claims should be construed such that pharmaceutical composition relates to the composition per se, and that the composition per se must be stable. We also argued that the composition per se, if it is stable, that one way to measure that stability is via photo stability. So photo stability at summary judgment, we argued and still contend, is an important component of the claims. However, the district court rejected that. Having rejected that, then we were confronted with the validity of the claims. The validity of the claims then becomes, has to be looked at then in the context that there is no photo stability requirement and that the composition without packaging, without light protective packaging, itself need not be stable. If all of that is true, then our argument on inherency clearly follows. And our argument on inherency, succinctly put, is that the compositions are fundamentally the same as the prior art. We have the key ingredients are formaldehyde dissolved in water at a pH of 5 with a buffer or a tonicity agent. The buffer or tonicity agent has been demonstrated as not to be critical. The formaldehyde concentration is also demonstrated not to be critical. And we know that when we look at the claims that are asserted, not all of which have any of those limitations as critical limitations in terms of their ranges, their numerical ranges, for example. And I can point the court to, for instance, if we look at the 344 patents and we look at Claim 1. Claim 1 requires the composition to be stable under long-term storage. Claim 1, however, does not have a motorol, does not have a pH, does not have a motorol concentration range limitation, does not have a pH range limitation, does not have a buffer concentration limitation, and does not have a tonicity range limitation, and yet that composition is stable. The asserted Claim 3 of the 344 patent, likewise, does not have any of those concentrations that are identified as being critical to the stability that is claimed. So what we have in this situation, perhaps different from many others, is we have the fundamental concept that the solution per se is stability is inherent. It is dependent upon the idea that we have for motorol in solution, for sure, but the idea is that the pH of that for motorol solution really dictates what the stability will be. And that pH was a pH that was known in the prior art. It was known by the Gao reference. It was known from the Murakami reference. It was known from the separate core lots if they're on sale. It was known to one skilled in the art from the separate core lots as from the doctrine of simultaneous invention. What they did in order to create a stable composition is they merely took that composition and refrigerated it. They did the same thing as described in the prior art. The Gao reference, for example, and the Redmond reference acknowledge that refrigeration… Can I just turn you on to a bar issue before you run out of your time? Sure. Do you think the on-sale bar applies to private third-party sales? Well, I don't. In terms of private versus public, I think there's potentially an option for that, but I don't think that we have a private sale here. Well, that's not really what I asked you, though. Let's assume we do have a private sale. Do you think that the on-sale bar can still apply even if it's a sale between – a private sale between third parties? Yes, I do, and I think the In re Caveney case. Which case? The In re Caveney case. Well, doesn't that almost suggest the opposite, that when you're looking at third-party sales, the on-sale bar isn't really applicable? It's the public use doctrine that's applicable. No, I don't believe so. I believe the Caveney case is focused on 102B as a sale and not as a public use. Certainly, public use has an element of public to it, but I think from 102B for an on-sale, I don't believe there's any case law that says we need to have a public sale. So I think if we had a sale between two companies, as long as they're not related, and I think that's also what the Brassler case suggests, that that would constitute a sale under 102B. As to the evidence of inherency, we have, as I indicated, the court discounted the evidence. I think that the court did so because the court concluded as a matter of law that inherency does not apply to the obvious misinquiry, and I believe that error of law is an error that needs to be reversed. As to the sale between Sepricor and ALP, we think the evidence is strong and points directly to the sale. We had ALP purchasing, excuse me, manufacturing for Sepricor, actual commercial product to be used for a clinical trial. There were hundreds of lots that were made, and there were thousands of, or hundreds of gallons that were made for the tens of thousands of dollars that were exchanged between the two parts. I think that evidence is in our record, and we've demonstrated that there are two different lots that are in question. The earlier lots invalidate the, are relevant to the first set of family, first family. I take it that it's not disputed that lot three anticipates the second family of patents. Yes, that is correct. But the district court found that the earlier lots didn't anticipate, right? Because they're different in some way. She found that the earlier lots do not anticipate the first family of patents. That is correct. What we're suggesting is that the court was erroneous in that view, also because of the nature of the claims. The claims, as I indicated before, don't necessarily have a limitation with respect to promoter oil concentration, for instance. And that was one of the distinguished, excuse me, the distinguishing factor. The same is true with respect to the buffer. That's a clear AR standard on that question. Yes, it is on that question of fact. That is correct. But on the question of obviousness, Your Honor, I believe it's a question of law, and I think that the district court still did not contend that the claims were, she did not address the question of obviousness of the first family of patents in view of the first separate core lots. And Day in its briefs did not either. So the inference would be that if the separate core lots are considered to be prior art to the first family, that there's a recognition even by Day that those patents would be invalid as obvious. We would have to agree with you on your obviousness argument apart from the oil and sale bar for the first family and the first two lots. I think the way Day has briefed the case, I think they've conceded that. Right, but we still have to agree with you on obviousness. Yes, you have to agree that obviousness, that the separate core lots are relevant from the standpoint of obviousness, either as an on sale or as separate patents. If we don't agree with you on that, and we don't find the district court's anticipation findings clearly erroneous on the first two lots, about no anticipation, then the on sale bar would just apply to render the second family invalid. Is that right? There's a lot going on. I'm just trying to get it sorted out. I understand it. And what I'm understanding the question is, if the court agrees with us that the first lots are on sale, and if the court agrees with us that the on sale event can relate to obviousness, and if the court agrees with us that the claims are obvious, that our contentions with respect to obvious are correct, then the consequence is invalidity. The controversy is also true. Let's hear from the other side, and you have rebuttal time. Mr. Chesler. Good morning, Your Honors. May it please the court, my name is Evan Chesler. I represent Day. I would like to address the issues that counsel raised, if I may. First, with respect to the claim issue, there is nothing, Your Honors, in this patent that refers in any way to photo stability. It's not a patent about photo stability. The word light doesn't appear anywhere in the patent.  In fact, when you look at the stability testing portion of the specification, which appears at 182 of the record, it is entirely about stability ovens and testing the material or heating the material at accelerated temperatures, then taking it out and testing to see how much chemical degradation, using chromatography technology, to see how much of the formotorol is still left in the compound. Nothing to do with light. That was simply a made-up argument, which the court properly below rejected, because there's nothing in the patent to support the notion that that has anything to do with the stability that's defined. Now, with respect to the validity issues that counsel has raised, let me turn first to the on-sale bar, if I may. Our position, quite simply, is there was no sale here. That's because the product was owned all along by Sepricor. It was owned all along by Sepricor. Sepricor provided its own compound to a contractor, ALP. The contract is in evidence. It says it was for services rendered to simply mix it and package it. The senior executive of Sepricor, who was involved in negotiating the contract and procured the service, testified as a live witness at trial. He said, we never paid for a product because we owned the product. We simply paid. We outsourced some services to ALP, and they gave us back our own material. The material was never sold. It's not like in the Brassler case, which involved these saw blades. The court explicitly found that they were sold to the inventor for the purpose of resales by the inventor. And, in fact, in that case, this court distinguished what it called fabrication services. It said this is not a fabrication services case, which would not implicate an on-sale bar. It was an actual sale for the purpose of resales, which were then made. So this is simply not a case in which there was a sale. And if there was not a sale, then the entire hierarchy of multiple hurdles which counsel has put forth in the court that they must overcome simply falls apart. With respect to Judge Hughes's question, our view of the law is that if it were deemed a sale, and it's not, a private sale between one third party and another third party may well be an on-sale bar as to those third parties. But it is not an on-sale bar with respect to the inventor. And this court has said over and over again. It said it in the Gore case. It said it in the Laporte case. It said it in the… Yeah, but Gore is talking about a secret method and not the sale of the product itself. Those two seem to be distinguishable to me. Well, Your Honor… It's not what we said in Laporte. I mean, in Laporte, we seem to clearly recognize that third-party sales can constitute an on-sale bar even if they're not connected to the inventor. Well, I believe, Your Honor, what the court said in Laporte was, this is toward the end of the opinion at 1583, that the inventor in that case cannot be viewed as a wholly innocent victim. He placed the means of commercializing his invention in the hands of the third party, Janssen, expressed no objection to Janssen's sale of the device embodying the invention to Laporte, the other third party, and shortly after that sale entered into an arrangement with the two third parties to patent the invention. And this is the court's words. His conduct violates one of the principal policies of 102B, which is to encourage early filing. If the inventor is unaware of those activities, the inventor can't be faulted for not early filing. The idea is you cannot attempt to commercialize and then sit back on your rights and then file late and still get a patent. That's not the circumstance that's here, Your Honor. There's no question that this inventor knew nothing about what Sepricor and ALT were doing. So you're saying as long as the inventor doesn't know anything about the sale, whether it's completely public and widespread, it's still not an on-sale bar? No, Your Honor. If it were completely public and widespread, his knowledge would be imputed. He can't say, I didn't read the newspaper, so I don't know about it. I'm talking about a situation where it was a private transaction, a non-public transaction, in which the inventor was not involved, and there's no evidence that the inventor knew about the non-public transaction. Those are the facts in Laporte. It was a non-public transaction about which the inventor knew, and the court took pains to point that out. And I would also point out— But where would you get this kind of exception for private sales from? The statute doesn't say anything about that. It would seem that our precedent suggests that when we're talking about private sales and the like, we're talking about the public use bar and not the on-sale bar. I would get it, Your Honor, not only from the policy, as I said, of timely filing and not sitting on your rights that you know are otherwise being made available to the public, either constructively or in fact. I'd also take it, Your Honor, from the Gore case, in which this court said, and I quote, there is no reason or statutory basis on which BUDs or croppers—those are the third parties—secret commercialization of a process, if established, could be held a bar to the grant of a patent to Gore on that process, Gore being the inventor. Yeah, but there's a difference, isn't there, between a secret transaction and a public transaction, which doesn't require announcement in the New York Times? In fact, under our on-sale bar law, I don't remember that we have a big distinction between something called a private sale and a public sale, do we? Your Honor, I don't know that there is a distinction. You can clearly see a difference in a secret transaction. Right. But this was not a secret transaction. Well, it was a confidential transaction as between Sepricor and ALT. There's no question about that. The contract is in evidence. As I said, the person who did the transaction testified. He said this was a confidential transaction between those two parties. I don't know whether there's— It's not confidential with the inventor, though. I mean, these two parties are completely separated. So it's one—assuming we disagree with you and find that it's a sale, they're two members of the public. One is selling it to the other. The fact that they've only sold it to each other and decided not to sell it to anybody else and to keep it between themselves, I don't see how that renders it, even if we agree that there's a secret exception here. Well, Your Honor, I don't know. I can't think of a case—maybe there is one. I can't think of a case where on those facts, that is a confidential transaction between those two third parties for which there's neither constructive nor actual knowledge by the inventor, where it was held to be an on-sale bar vis-a-vis the inventor. Those are not the facts in LaPorte. But you seem to place a lot of weight on the knowledge by the inventor, but I don't see how that's really relevant to the question of whether a secret sale between third parties is useful. I mean, if knowledge of the inventor is required, then it doesn't matter whether the sale is public or private. We could deem the sale public, and if knowledge of the inventor is required, then there's clearly no knowledge here. But I'm saying it doesn't have to know it if it's, in fact, a public transaction. We all are charged with knowledge of the public. That seems to put us down a big rabbit hole of looking at documents and determining that this clause made it confidential, this clause didn't. It was only between two parties and not mentioned to the public, so therefore it's private. I mean, a sale is a sale. Well, Your Honor, all right. Let me come back to basic principles here. Number one, as I said before, our position is there was no sale. You could avoid all of this line drawing on this issue that we were drawing by simply refusing to treat it as a sale. We do. And that was our first point in our brief. It was the first point I made today. It is our principal point. I do not believe that this Court should find or could, frankly, find that the Court's findings with respect to the non-sale were clearly erroneous findings. Where the contract involved says it's not a sale, where the person who did it says it's not a sale, I don't see how that could be clearly erroneous. And the line drawing that we're talking about, I agree, is never reached by this Court if, in fact, the Court determines that it's not a sale. The other thing, I believe, just on this point, and then I'm going to go to the obviousness point. The other point is if, in fact, there had been – I'm sorry – if the fact is that there was no sale with respect to the two parties involved, and there's nothing about the transaction – and I said this before, I just want to close on this point – with respect to the ownership of the product involved, it never left SEPRACORP. It stayed with SEPRACORP throughout. The impact on the industry of saying you cannot outsource that kind of service without triggering the sale would be profound because that's commonly what happens in this industry. Everybody doesn't have all of the manufacturing machinery and technology in-house. They outsource all the time, and that's what happens. Why is it that big of an impact if you're going to make that kind of sale and you know that the non-sale bar applies and you just file for your patent? Well, Your Honor, there are lots of people who in this industry believe, as my client does, that it was not a sale. And therefore, there wouldn't be a non-sale bar if you, in fact, hired somebody to mix – Sure, but you talk about impact on the industry. It may be that there's some impact looking back, but if we make it clear, there's no impact going forward. Going forward, if you said what the rules are, people would – Can I ask you just one thing? Was this arrangement – was this for the use – the production was for the use of clinical trials? I believe so. Why wasn't – why didn't anybody argue that this was for experimental uses? I mean, that seems like it would have been the argument about why this is not covered by the non-sale bar if it was produced. And that's where it seems to me you might have some impact. If you have a small drug manufacturer that invents something but doesn't have the capacity to manufacture it for clinical trials. But that would be covered by the experimental use. I agree with that, Your Honor. But the way – We didn't make that, right? No. The way it played out at trial was this was not a sale transaction, and that was virtually the entire attention that was paid to it at trial. But I may turn to obviousness before I sit down. So counsel talked about inherency, and I want to turn to inherency. First of all, counsel said that the court said as a matter of law, inherency doesn't apply to obviousness. And I respectfully say to this court, that's not so. At appendix page 63, the court plainly dealt with the question of inherency on a factual basis. The district court made a series of fact findings about the prior art, which this court, again, would have to find clearly erroneous in order to overturn it. She did not make a finding of law that inherency does not apply. And, in fact, what the evidence showed here is that there were two prior art samples, which Teva hired an expert to test. And another expert came in and testified about this separate expert's testing and said, well, he tested these two samples and found that they had the same stability characteristics as the invention. In fact, what the district court found was that in each instance, the prior art samples had been modified by the expert who did the testing. Modified in ways that their own expert at trial conceded could well affect stability. So there was, as the district court analyzed it, there was absolutely no evidence here that samples that actually corresponded to what was in the prior art had ever been tested for their stability. Because the prior art samples that had been tested did not, in fact, correspond to what was disclosed in those two prior art references. Now, with respect to the doctrine of inherency, it plainly does apply. The court said in part that it applies in the obviousness context, said it's a very high standard, and it necessarily must be present or the natural result of the combination of elements explicitly disclosed in the prior art. In fact, several things about the prior art are important. First, the prior art taught explicitly away from this invention. It said if you put this substance in water, it will immediately degrade. And prior art reference after prior art reference said keep them separate, keep your powder dry. If you put the powder in the water, it will degrade. And one of the prior art references, Redmond said, refrigeration will not solve this problem. It recognizes refrigeration as a factor to consider and says it will not solve the problem. And in fact goes on to say the way to solve the problem is to create a device with two columns, put the powder in one, put the water in the other, combine them right before inhalation use. And that's the way to avoid degradation. So the prior art explicitly taught it would degrade in water and refrigeration would not solve the problem. Now, the respondent says, well, it was inherent that this stability would be there. And in fact, when you look at the prior art, there's nothing that says that if you did what the prior art elements were and you combined them, you would get the natural result of the stability that's claimed in the patent. In fact, the stability that's claimed in the patent is quite specific. And it talks about a certain percentage of formoderal degradation at the end of one year when it's refrigerated at five degrees centigrade and a certain percentage of degradation at one month when it's kept at room temperature. There's nothing in the prior art that suggests anything like that. And the testimony by one of the principal inventors was that they didn't believe it would work when they tried it, that there was no reason why they believed that it would actually perform as it ultimately did perform, that they were surprised by the result. And that's absolutely consistent with all of the prior art. In fact, the last piece of prior art that was written prior to the time of the invention said that this is unstable in water, just like the prior art for years before that had said. So while inherency as a legal matter does apply in the obviousness context, as this court said in par, high standard, but it applies, there was nothing in fact here that renders the district court's factual findings about inherency clearly erroneous. On this record, what the district court found was not only not clearly erroneous, it was the clear result of the evidence that was presented to the district court. Keeping your powder dry has been a longstanding practice in this country. Yes, Your Honor, it is. And apparently it was the prior art in this case as well. Unless the court has any questions, I think I've addressed the issues which counsels raised. If there's any questions, thank you, Mr. Chesson. Thank you. Mr. Bergamo. Yes, Your Honor. With respect to inherency, I think the district court made it very clear. At A63, the court said, with respect to inherency, such data is not relevant to an assessment of whether the asserted claims were obvious. I don't think it could be any clearer. I think the questions that were raised in the context of the argument here were the question of was there anticipation, and I also think that the court clearly erred in light of the testimony of record in this case from the inventor who testified that inherency, that the stability of the Fremont Royal Acquiesce Solutions is inherent, the expert, Dr. Myrtle, on behalf of Teva, who so testified, and similarly the testimony of Dr. Hastings, which was the expert for Day. There is no doubt, it's like a carton of milk. If I put a carton of milk on the table or if I put a carton of milk in the refrigerator, that carton of milk has the same stability. It's the conditions under which you look at stability that cause you to determine how it's stable. For example, if you put the milk on the counter, it's not likely to last as long, or it will not last as long, as when you put the same milk in the refrigerator. The reason is because the conditions define stability. Day's patents define stability in several different ways, one of which is simply long-term storage. That has nothing to do with the time and temperature limitations we've talked about. The other thing is the refrigeration concept was well-known. People have been refrigerating for years just as they've been keeping their powder dry. So I think we have to look at the context of the obviousness from the standpoint of inherency, and I think the record shows that the court was clearly erroneous in terms of its factual findings and that it erred as a matter of law in concluding that inherency is not part of the obviousness inquiry. With respect to the on-sale, they did not argue experimental use during the case, and rightfully so. In this case, the promoter-all solution that ALP made for Sepricor was pursuant to a contract. The product was ready for patenting under the FAP versus Wells analysis. The product was complete. It was ready to be taken into clinical trials. So you do agree it was Sepricor's product? No, I do not, Your Honor. What I agree with is that Sepricor supplied the dry powder. ALP then converted that dry powder to something that was useful for Sepricor, that is an inhalation solution product that was then going to be used for the clinical trials and ultimately for commercial sale. So I do not agree that the ownership interest in this case that Sepricor held in the promoter-all had anything to do with the question of sale. The Gore case that's cited by plaintiffs was distinguished by Laporte. In the Gore case, we're looking at the secret commercialization of an invention where the invention was a process and the process was not apparent from the product that was put into the public domain. As the Laporte court said, the question is not whether the sale, even a third-party sale, discloses the invention at the time of the sale, but whether the sale relates to a device that embodies the invention. The device, the product that Sepricor bought from ALP was a product that embodied the invention in all ways. With respect to the actual sale, Mr. Wald, who testified at trial, also had testified in his deposition, and this is in the record as well, and he testified, and I'll read it, quote, Was there a written contract between ALP and Sepricor with regard to the manufacturing of the clinical trial batches for our promoter-all? Answer. Prior to each batch, Sepricor negotiated terms and conditions for the manufacture of the batch and created a purchase order. All of the documents that we've submitted into evidence reflect a purchase order between ALP and Sepricor for the purchase of a product, not for the purchase of services, not for the purchase of mere packaging. We have ALP being an active member or party to a transaction, a commercial transaction for the sale of product between ALP and Sepricor. Okay. Thank you, Mr. McGowan. Thank you. The case is taken under submission.